IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-83

No. 137A21

Filed 15 July 2022

IN THE MATTER OF: B.E., C.E., Q.E., C.E., Jr.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from an order entered on 16 February 2021 by Judge James Randolph in District Court, Rowan County. This matter was calendared for argument in the Supreme Court on 1 July 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jane R. Thompson for petitioner-appellee Rowan County Department of Social Services; and Maggie Dickens Blair for appellee Guardian ad Litem.*

*Christopher M. Watford for respondent-appellant father.*

*J. Thomas Diepenbrock for respondent-appellant mother.*

MORGAN, Justice.

Respondent-father appeals from the trial court's order which terminated respondent-father's parental rights to his four children: B.E. (Brian),[1] a minor child born in November 2016; C.E. (Cyrus), a minor child born in September 2015; Q.E. (Quintessa), a minor child born in December 2014; and C.E. Jr. (Craig), a minor child born in April 2008. Respondent-mother appeals from the same order of the trial court

---

[1] We use pseudonyms to protect the juveniles' identities and for ease of reading.

which terminated respondent-mother's parental rights to her children Brian, Cyrus, and Quintessa. Both respondents challenge the grounds for termination found by the trial court. Respondent-father also challenges the trial court's denial of his motion to continue the termination of parental rights hearing. We conclude that respondents' arguments are meritless and affirm the trial court's order which terminated the parental rights of both respondent-father and respondent-mother.

## I.    Factual and Procedural Background

Petitioner Rowan County Department of Social Services (DSS) became involved with this family in early 2016 after receiving a report that respondent-father had dragged respondent-mother from her bed and stomped on respondent-mother's head and neck while in the presence of two of their children. DSS initiated at-home services, but respondents largely resisted these efforts. When Brian was born in November 2016, he tested positive for the presence of marijuana in his system and weighed only four pounds. Respondent-mother told hospital staff that she was unaware of her pregnancy.

DSS filed a juvenile petition alleging that the four children were neglected and dependent juveniles on 15 December 2016. The petition laid out respondents' significant history of domestic violence, substance abuse, and homelessness, as well as their failure to provide adequate supervision and medical care for their children. DSS also alleged that respondent-mother "refuses to parent her children, indicating

that she is 'done' " and that respondent-mother was "overwhelmed with her life and her poor choices and wants [DSS] to take care of her children." Lastly, DSS alleged that respondent-father was "on the run from law enforcement for stealing a golf cart and fighting deputies" and that DSS's attempts to contact respondent-father were unsuccessful. Based on these verified allegations, the trial court granted nonsecure custody of the children to DSS, which in turn placed the children in foster care.

¶ 4        On 2 February 2017, respondents consented to an adjudication of neglect and dependency based on the allegations in the petition, and on 15 March 2017, the trial court entered a written adjudication and disposition order. The trial court kept the children in DSS custody and awarded biweekly supervised visitation to respondent-mother. Respondent-father, who was incarcerated, was ordered by the trial court to participate in any available services while in jail and upon respondent-father's release, to seek services addressing his issues with substance abuse, domestic violence, mental health, anger management, parenting education, stable housing, and employment. The trial court ordered respondent-mother to obtain and maintain adequate housing; obtain and maintain employment; obtain assessments for substance abuse, mental health, anger management, and domestic violence, and comply with any resulting recommendations; obtain a psychiatric evaluation and comply with any recommended medication management; and complete approved parenting classes and show the skills that she learned during her visitation with the

children. Both parents were ordered to submit to random drug screens and to sign any releases which were necessary to allow DSS and the trial court to monitor respondents' progress.

¶ 5 The trial court conducted a review and permanency planning hearing in September 2017. In its resulting order, the trial court found that respondent-mother was diagnosed with histrionic personality disorder, borderline personality disorder, and severe alcohol use disorder. Respondent-mother also tested positive for alcohol in May 2017, and she refused drug screens in July and September 2017. Respondent-mother also was found to have made some progress on her case plan by completing a parenting class, completing a domestic violence assessment, working to obtain housing, and obtaining employment.

¶ 6 As to respondent-father, the trial court found that he had seven pending felony charges, had been terminated from a domestic violence program for excessive absences, had missed four of six individual counseling sessions, and could not verify his employment to DSS. More favorably, respondent-father was determined to have completed twenty substance abuse sessions and submitted two negative drug screens. The trial court thereupon ordered a primary permanent plan of reunification with a secondary plan of custody with a relative or court-approved caretaker.

¶ 7 On 11 October 2017, both respondents were arrested on charges of trafficking heroin and cocaine, possession with intent to sell and deliver marijuana, and

maintaining a dwelling for the purpose of drug sales. Respondent-father was also charged with the offense of engaging in a continuing criminal enterprise. Respondent-mother was released on bond on 16 November 2017. Respondent-father remained incarcerated as of the occurrence of the next permanency planning hearing on 25 January 2018.

¶ 8 In its order entered after the 25 January 2018 hearing, the trial court found that respondent-mother was pregnant and due to deliver the baby in April 2018. Respondent-mother tested positive for alcohol on 7 December 2017, and tested negative for alcohol on 14 and 21 December 2017. The trial court also determined that respondent-mother had completed some recommended programs and was attending different types of therapy sessions. Respondent-mother was also working twenty-four hours per week at a job that she obtained through a staffing agency. Respondent-father was not compliant with his case plan, but he regularly sent his children cards and letters. The trial court changed the plan to a primary permanent plan of reunification and a secondary plan of adoption and ordered the case plans to "be 50/50."

¶ 9 The next permanency planning hearing was held in July 2018. In the order which it issued following the hearing, the trial court found that respondents' new child Regina[2] was born on 15 April 2018 and that Regina's meconium tested positive

_____

[2] A pseudonym.

for marijuana. As a result, DSS began in-home family services. Respondent-mother tested positive for alcohol in June and July 2018, she had only attended six of sixteen possible dialectical behavior therapy (DBT) sessions, and respondent-mother's psychological evaluation determined that she lacked sufficient personal or mental health functioning to be found capable of meeting the demands of parenting a child. The trial court also found that respondent-mother was temporarily living with her uncle and that she did not have a safe and stable permanent home.

The trial court found, with regard to respondent-father, that respondent-father pled guilty to one count of possession of a firearm while trafficking drugs under 18 U.S.C. § 924(c) on 15 June 2018, which is an offense that carried a term of imprisonment of five to forty years. Respondent-father's sentencing was scheduled for 28 September 2018. DSS was unaware of any services in which respondent-father was participating while incarcerated, and he continued to send cards and letters to the children. The trial court changed the primary permanent plan to adoption, with a secondary plan of reunification.

On 2 January 2019, DSS filed a petition to terminate the parental rights of both respondent-mother and respondent-father on the ground of neglect and the ground of willfully leaving the children in an out-of-home placement for more than twelve months without making reasonable progress to correct the conditions leading to their removal. *See* N.C.G.S. § 7B-1111(a)(1)–(2) (2021). DSS also alleged

dependency as another ground for termination of respondent-father's parental rights. N.C.G.S. § 7B-1111(a)(6) (2021).

¶ 12      After the termination of parental rights petition was filed, the matter was continued three times over the course of May, June, and July 2019 in order to allow time for respondent-father's counsel to arrange the incarcerated respondent-father's telephone attendance at the hearing. At the resulting rescheduled hearing on 5 September 2019, respondent-father's counsel moved to continue the case for a fourth time, as the attorney recounted his unsuccessful efforts to secure respondent-father's telephone presence at the hearing. Counsel represented that he was repeatedly ignored by officials at respondent-father's correctional facility. The trial court denied the fourth motion for a continuance which was made by counsel for respondent-father, and the trial court began the termination hearing.

¶ 13      The case was heard over a span of seven dates between September 2019 and September 2020. During this period of time, DSS closed its in-home services case for the juvenile Regina. On 16 February 2021, the trial court entered its termination of parental rights order, in which the trial court determined that the parental rights of both respondent-mother and respondent-father were subject to termination under N.C.G.S. § 7B-1111(a)(1) and (2). The trial court concluded that termination of respondent-father's parental rights to all four of the children was in the juveniles' best interests. As to respondent-mother, the trial court concluded that termination of

her parental rights was in the best interests of the juveniles Brian, Cyrus, and Quintessa but not in the best interests of the juvenile Craig. Thus, the trial court terminated respondent-father's parental rights to all four of his children and terminated respondent-mother's parental rights to her children Brian, Cyrus, and Quintessa. Both respondents appealed.

## II. Motion to Continue

¶ 14    Respondent-father argues that the trial court violated his due process rights when it denied his counsel's motion to continue the termination of parental rights hearing. Respondent-father notes that "as an inmate with the Federal Bureau of Prisons, [he] had no individual control over his ability to participate in such an important matter" and so the trial court's refusal to grant respondent-father a fourth continuance denied him the opportunity to participate in the hearing and therefore rendered the termination proceedings fundamentally unfair.

> Ordinarily, a motion to continue is addressed to the discretion of the trial court, and absent a gross abuse of that discretion, the trial court's ruling is not subject to review. However, if a motion to continue is based on a constitutional right, then the motion presents a question of law which is fully reviewable on appeal.

*In re J.E.*, 377 N.C. 285, 2021-NCSC-47, ¶ 12 (extraneity omitted).

¶ 15    Here, the record does not reflect that respondent-father's counsel moved to continue the termination hearing in order to protect respondent-father's constitutional rights. The trial court allowed respondent-father's counsel to offer

sworn testimony about counsel's unsuccessful efforts to secure respondent-father's telephonic participation in the hearing. Counsel then made the following presentation concerning the attorney's view of the pertinent case law regarding the occurrence of the hearing in respondent-father's absence:

> Okay. So Judge Brown, Honorable Brown asked us to just look and see the case law regarding the presence of a parent in a termination of parental rights proceeding, as to whether that was something that would present the paramount problem, or at the very least, a definite appeal holding, bring back down issue. I cannot say that it's favorable to my client, what I had seen in the case law, and I don't know if I want to be heard more on that, but again, I would anticipate I'll probably have to attempt to appeal in this case just because of the situation, but you know, depending on the outcome, but I did not find my client's presence to be an actual bar to proceeding in this case.

Counsel did not argue to the trial court that the continuance which he sought on behalf of respondent-father was necessary to protect respondent-father's right to due process or any other constitutional right. *See id.*, ¶ 14 ("A parent's absence from termination proceedings does not itself amount to a violation of due process."). Consequently, respondent-father has waived any appellate argument that the trial court's denial of his motion to continue violated respondent-father's constitutional rights, and we therefore review this issue only for an abuse of the trial court's discretion. *See id.*

> In reviewing for an abuse of discretion, we are guided by the Juvenile Code, which provides that continuances that extend beyond 90 days after the initial

petition shall be granted only in extraordinary circumstances when necessary for the proper administration of justice. N.C.G.S. § 7B-1109(d) (2019). Furthermore, continuances are not favored and the party seeking a continuance has the burden of showing sufficient grounds for it. The chief consideration is whether granting or denying a continuance will further substantial justice.

*Id.* ¶ 15 (extraneity omitted).

¶ 16        At the start of the termination of parental rights hearing, counsel for respondent-father testified about counsel's efforts to secure respondent-father's remote participation. In the termination order, the trial court made the following unchallenged findings of fact consistent with the testimony of respondent-father's counsel:

> 7. Prior to any evidence being received by the court, [respondent-father's counsel] reported to the court that there appeared to be no reasonable way for [respondent-father] to be able to participate in the hearing. [Counsel] made phone calls to the highest levels in the prison, sent written correspondence, called complaint lines to the Federal Prison Bureau, called the warden and the warden's executive assistant, left voicemails, and called [respondent-father]'s prison counselor. [Counsel] communicated early on with [respondent-father] and his counselor regarding court dates; however, [counsel]'s calls and emails to confirm [respondent-father]'s in-person and phone participation have not been answered or returned. [Counsel]'s attempts have gone unanswered; however, he was able to contact [respondent-father] in April 2019 to file an answer on behalf of [respondent-father] to the TPR petition.
>
> 8. [Counsel] received a letter dated July 18, 2019 . . . from [respondent-father] stating his wishes to participate in the

hearing; however, [counsel] reports that the prison officials have not been responsive to assist with making [respondent-father] available for hearings.

9. Prior TPR hearing dates were continued, on May 9, 2019, June 27, 2019, and July 25, 2019, at the request of [respondent-father's counsel] on behalf of [respondent-father] because [counsel] was making efforts to have his client participate in the hearing from federal prison.

10. [Respondent-father's counsel] made a motion to continue for the presence of [respondent-father], as [respondent-father] requested to participate in the matter. As it stands, [counsel] has no information regarding if it is against [the] federal prison's policy for [respondent-father] to participate or if it is simply that no person at the prison will answer the phone or otherwise cooperate with making him available for the hearing.

Based on these findings, the trial court decided that respondent-father's "motion to continue should be denied since this hearing has been delayed more than one time to allow arrangements to be made for [respondent-father] to participate in the hearing, and delaying the hearing again would not result in a different outcome."

¶ 17 We discern no abuse of discretion in the trial court's decision to deny respondent-father's fourth motion to continue. At the time that the trial court denied the continuance motion at issue, it had been more than eight months since the filing of the termination of parental rights petition—well beyond the ninety-day timeframe prescribed by N.C.G.S. § 7B-1109. The case had already been continued three times on behalf of respondent-father, and despite the extensive efforts by respondent-father's counsel to contact respondent-father's prison facility to secure respondent-

father's remote attendance, which had all been accommodated by the trial court, counsel for respondent-father was not making any progress in achieving the parent's telephonic participation in the termination hearing and there was no indication that further delay would improve the chances of respondent-father's remote participation in the hearing. Under these circumstances, respondent-father did not meet his burden of showing that a fourth continuance of the termination hearing would further substantial justice, and thus the trial court properly denied respondent-father's motion to continue. *See In re J.E.*, ¶ 15 (emphasizing that the Juvenile Code discourages continuances, particularly those "that extend beyond 90 days after the initial petition" (citing N.C.G.S. § 7B-1109(d) (2019))).

### III.    Grounds for Termination

Both respondents argue that the trial court erred in concluding that grounds existed to terminate their respective parental rights. We review a trial court's adjudication that grounds exist to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re R.G.L.*, 379 N.C. 452, 2021-NCSC-155, ¶ 12 (quoting *In re B.O.A.*, 372 N.C. 372, 379 (2019)).

"Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97 (1991)). "Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *Id.* "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

## A. Respondent-Father

Respondent-father's parental rights were terminated upon the existence of two grounds: neglect under N.C.G.S. § 7B-1111(a)(1) and failure to make reasonable progress under N.C.G.S. § 7B-1111(a)(2).

As we first consider the ground of neglect here, the General Statutes of North Carolina authorize the termination of the parental rights of a parent if the parent neglects his or her child such that the child meets the statutory definition of a "neglected juvenile." N.C.G.S. § 7B-1111(a)(1) (2021). A juvenile is deemed to be "neglected" when the child's parent, *inter alia*, "[d]oes not provide proper care, supervision, or discipline" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2021).[3]

> Termination of parental rights based upon this statutory
> ground requires a showing of neglect at the time of the

---

[3] This statutory definition was amended by Session Law 2021-132, which went into effect on "October 1, 2021, and applies to actions filed or pending on or after that date." Act of Sept. 1, 2021, S.L. 2021-132, § 1(a), 2021 N.C. Sess. Laws 165, 170.

termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841 (2020) (extraneity omitted). "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding." *In re Ballard*, 311 N.C. 708, 715 (1984) (emphasis omitted).

¶ 21      Respondent-father does not dispute that his children were previously adjudicated to be neglected juveniles, but he argues that the trial court erred in determining that there was a "very high" risk of repetition of neglect if the children were returned to his care. Respondent-father contends that the trial court failed to consider his ability to participate in services during his incarceration when reaching its conclusion that neglect would likely be repeated if the children were returned to him.

¶ 22      Respondent-father challenges two findings of fact which are relevant to the trial court's neglect determination:

> 36. On March 21, 2017, [respondent-father] tested positive for Cocaine and Marijuana. He completed his recommended 20 hours of substance abuse sessions; however, he missed more than half of the batterer's intervention sessions and was terminated from the program in September 2017. He was arrested in August

2017 for failure to pay child support on another child not involved with DSS, but he paid the amount with the help of [respondent-mother] and was released. [DSS] is not aware of any services or programs that [respondent-father] has participated in or completed during his incarceration. He has not visited with or spoken to his children since September 28, 2017.

37. In [respondent-father]'s answer to the allegations in the TPR petition he admits to being a no call no show for his individual counseling session on May 4, 2017, June 8, 2017, August 16, 2017, and September 6, 2017. [Respondent-father] also admitted that he has not participated in any substance abuse, mental health, parenting education, or domestic violence services while incarcerated.

With regard to Finding of Fact 36, respondent-father argues that he did not miss "more than half" of his batterer's intervention sessions in September 2017, citing earlier orders entered in the case. However, Roxie Cashwell, who was the DSS social worker assigned to work with the family at that time, specifically testified that, as to respondent-father's participation in the batterer's intervention program, respondent-father "missed more than half of the required sessions and so he was terminated from the program." The social worker's unequivocal testimony provided clear, cogent, and convincing evidence to support the challenged Finding of Fact 36.

Respondent-father also submits that while the portion of Finding of Fact 36 was "technically correct" in stating that DSS was unaware of any services that respondent-father completed in prison, nonetheless it "does not address whether [DSS] actually met its burden to prove such services were actually available."

Respondent-father's argument concerning this point is part of his broader contention that the trial court erred in concluding that grounds for termination of parental rights exist, to the extent that the conclusion that such grounds are existent is supported by this passage of the trial court's Finding of Fact 36. Although we address this argument in further detail below, we recognize that here respondent-father does not assert that this portion of Finding of Fact 36 was unsupported by the evidence, and hence we leave the finding undisturbed.

¶ 25    As to Finding of Fact 37, respondent-father asserts that the finding misrepresents his answer to the termination of parental rights petition. Respondent-father claims that he denied, rather than admitted, DSS's allegation that he "has not participated in any substance abuse, mental health, parenting education, or domestic violence services known to [DSS] while incarcerated." On this point, respondent-father's argument is supported by the record and the trial court's finding is not supported. Respondent-father's response to the termination petition specifically stated that he denied the relevant allegation,[4] "in that he has participated in substance abuse and parenting education classes while incarcerated." We therefore disregard Finding of Fact 37 because it is not supported by clear, cogent, and convincing evidence. *See In re J.M.J.-J.*, 374 N.C. 553, 559 (2020) (disregarding

---

[4] DSS lodged the allegation under both the neglect ground and the failure to make reasonable progress ground, and respondent-father denied both allegations in identical fashion.

adjudicatory findings of fact not supported by clear, cogent, and convincing evidence).

¶ 26        With respect to the ground of neglect itself, respondent-father argues that the trial court's findings fail to show his circumstances at the time of the termination of parental rights hearing, such that the trial court could not adequately assess whether there was a likelihood of repetition of neglect if the children were returned to his care. Respondent-father contends that the trial court centered its decision to terminate his parental rights entirely on his imprisonment. Respondent-father believes that "[t]he court's decision seems frozen in time as of October 2017 and implies there was nothing that the Respondent-Father could do to change the court's predisposition to terminate parental rights through incarceration."

> A parent's incarceration may be relevant to the determination of whether parental rights should be terminated, but our precedents are quite clear—and remain in full force—that incarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision. Thus, respondent's incarceration, by itself, cannot serve as clear, cogent, and convincing evidence of neglect. Instead, the extent to which a parent's incarceration . . . support[s] a finding of neglect depends upon an analysis of the relevant facts and circumstances, including the length of the parent's incarceration.

*In re K.N.*, 373 N.C. 274, 282–83 (2020) (extraneity omitted).

¶ 27        Here, the trial court's findings of fact demonstrate that it properly considered respondent-father's incarceration as a relevant factor, while also making other findings which showed a likelihood of future neglect of the children by him. The trial

court found facts which chronicled respondent-father's behavior during the entire history of the case, encompassing both the period of time when he was incarcerated as well as the span of time when he was released. These findings show that respondent-father was in jail for drug offenses when the initial juvenile petition was filed in December 2016 and that after his release, respondent-father tested positive for cocaine and marijuana and was arrested for failure to pay child support. Although respondent-father successfully completed twenty hours of substance abuse sessions, he failed to complete his batterer's intervention program. After the children had already been in the custody of DSS for many months, respondent-father was arrested in October 2017 for trafficking heroin and cocaine; these crimes constitute offenses for which he was eventually sentenced to several years in federal prison. Respondent-father had not seen, nor spoken with, his children since September 2017—just prior to this arrest—with approximately three years having passed between the last time that respondent-father had such contact with the juveniles and the last date of the termination of parental rights hearing.

¶ 28        Additionally, respondent-father does not challenge any of the trial court's findings of fact which address a primary reason for DSS's involvement with respondents; namely, the extensive history of domestic violence between respondent-father and respondent-mother. After respondent-father was released from incarceration in March 2017, respondent-father engaged in domestic violence against

respondent-mother merely one month later in April 2017. The trial court specifically found that "there is a great likelihood that [respondents] will reunite when [respondent-father] is released from prison. Their history of domestic violence and drug dealing renders them unsafe to parent as a couple."

¶ 29        The evidence presented at the termination of parental rights hearing and the trial court's resulting findings of fact which were based upon the evidence amply support the trial court's determination that there was a "very high" likelihood of repetition of neglect if the children were returned to respondent-father's care. Respondent-father does not challenge the trial court's finding that "[the children] have been in the nonsecure custody of [DSS] for forty-six (46) months, and [respondent-father] is no closer to reunification today than when the original juvenile petition was filed on December 15, 2016." During the brief time that respondent-father was released from incarceration while this juvenile case was pending, he made minimal progress on his case plan and engaged in further domestic violence and drug trafficking, which in turn led to a new, longer period of incarceration. The trial court further determined that whenever respondent-father's incarceration ends, he is likely to return to his toxic relationship with respondent-mother, despite their unaddressed problematic cycle of domestic violence that the trial court found "renders them unsafe to parent as a couple." Based on these findings, the trial court properly concluded that respondent-father's parental rights could be terminated based upon the ground of

neglect. Since this Court has concluded that one termination ground is supported by the evidence and the trial court's resulting determinations, we decline to address respondent-father's arguments which dispute the existence of the other termination ground found by the trial court under N.C.G.S. § 7B-1111(a)(2). *See In re A.R.A.*, 373 N.C. 190, 194 (2019) ("[A] finding of only one ground is necessary to support a termination of parental rights . . . .").

## B. Respondent-Mother

Respondent-mother's parental rights to the juveniles Brian, Cyrus, and Quintessa were also terminated based on the ground of neglect. Like respondent-father, respondent-mother does not contest the fact that her children were previously adjudicated to be neglected, but she instead argues that the trial court erred by determining that there was a very high likelihood of repetition of neglect if the children were returned to her care. *See In re R.L.D.*, 375 N.C. at 841.

Respondent-mother challenges the following findings of fact which are relevant to the determination of the existence of the ground of neglect with regard to her:

> 22. Although [respondent-mother] has attended multiple DBT group sessions, [DSS] has had, and continues to have, grave concerns about her mental health. [Respondent-mother] displays anger quickly and in front of service professionals, social workers, foster parents, and the children. She presents as very hyper at times and lacks focus. She has been observed by social workers and the undersigned on multiple occasions talking to herself in court.

. . . .

26. Throughout the life of the case, [respondent-mother] has had sporadic employment. . . .

. . . .

40. [DSS] and [the guardian ad litem] contend that sufficient evidence of neglect and continuing neglect has been presented, and the undersigned agrees. [Respondent-mother] has not shown that she can parent, care for, or provide for all four children, and she has not demonstrated that she can control her anger and negative behaviors. . . .

41. . . . Despite attending multiple individual therapy sessions [respondent-mother] has continued to exhibit poor anger management and coping skills. The histories of [respondents] provide further evidence that the probability of the repetition of neglect of the juveniles is very high. [Respondent-mother] is not in a position to care for the juveniles due to her lack of responsible decision making, history of being dishonest with [DSS], mental health issues, and questionable stability.

Respondent-mother challenges the description of her employment history in Finding of Fact 26 as "sporadic." She relies on DSS Social Worker Cashwell's testimony that "[respondent-mother] has always been able to get a job" to refute the trial court's finding. However, the term "sporadic" was expressly utilized by the social worker when she testified about respondent-mother's employment history as follows: "[Respondent-mother] will work somewhere for a couple weeks, and then she will not work for a couple weeks and then go somewhere else and work for a month or two, and then not, so it's very *sporadic*." (Emphasis added.) DSS Social Worker Constance Ebomah, who inherited the case from Social Worker Cashwell, also testified that

Social Worker Ebomah was generally unable to verify respondent-mother's employment and agreed with the DSS attorney "that even though there may have been some mention of employment here and there, and perhaps even some proof of employment in March 2019, there were times [respondent-mother] clearly was not employed." The testimonial accounts of the two social workers involved in this case provided clear, cogent, and convincing evidence to support the trial court's Finding of Fact 26.

¶ 33        Respondent-mother argues that Findings of Fact 22, 40, and 41 are not supported by the record because they do not accurately reflect her circumstances as of the time of the termination of parental rights hearing with respect to her mental health, anger issues, and ability to parent her children. Respondent-mother represents that she made significant progress on these issues during the years that the case proceeded, such that there was no longer a risk of repetition of neglect if the children were returned to her. Respondent-mother posits that, at the time of the termination of parental rights hearing, she had (1) substantially complied with her case plan, as reflected by the trial court's findings that she had maintained housing and employment since January 2019; (2) been consistent with her mental health treatment; (3) not had a positive screen for controlled substances since February 2019; and (4) "substantially complied with the court's orders."

¶ 34        In support of her contention that the trial court's findings ignore the progress

that she had made up to the occurrence of the termination of parental rights hearing, respondent-mother cites the testimony of Social Worker Cashwell, who was the case social worker from June 2017 until she became a social worker supervisor in May 2018, and the testimony of Social Worker Ebomah, who succeeded Cashwell as the case social worker in May 2018 and served in this capacity until May 2019. Social Worker Cashwell testified on 5 September 2019 at the termination of parental rights hearing that respondent-mother "is a little calmer and you're able to talk to her. . . . I'm not getting the rambling through the conversation that I used to get when she would go off on random tangents. She still has her bouts, but overall the interactions that I have had with her, I have seen a change, a positive change." During the termination hearing on 24 October 2019, Social Worker Ebomah rendered the following testimony about Social Worker Ebomah's interactions with respondent-mother as the two of them discussed aspects of respondent-mother's behavior in pursuing the case plan:

> [W]hen I looked back at how she would handle and deal with everyone else before I became her worker, *I didn't experience a lot of the explosive when — she wasn't like that with me.* And like I said, she would get upset sometimes, and we'd have situations to where I told her that, you know, my exact words to her was, [respondent-mother], you have to stop acting like you're crazy when you are talking and dealing with people. You have to calm down and listen. Because you're not going to like everything people say to you. And you know, the only thing she said to that was "yes, ma'am". I used to get that a lot with her; yes, ma'am; no, ma'am; yes, ma'am; no, ma'am. That's how she was with

me most of the time.

(Emphasis added.) When she resumed her testimony at the termination hearing's 12 December 2019 session, Social Worker Ebomah agreed, consistent with her earlier account, that respondent-mother would receive constructive feedback and that her therapy was "having an impact in her personality and keeping her a lot more calmer."

¶ 35        Despite these positive observations by Social Worker Cashwell and Social Worker Ebomah regarding respondent-mother's improved demeanor, both social workers also expressed concern about respondent-mother's issues and doubted respondent-mother's ability to parent all of her children together. Social Worker Cashwell ended her testimony by stating that respondent-mother "has made some great improvements, though I do think that she has still some work to do if she is going to manage five children 100 percent." Social Worker Ebomah testified that when she observed visits between respondent-mother and all of respondent-mother's children, Social Worker Ebomah was "concerned about that because although she was appropriate with them, it was just so overwhelming. She just didn't know what to do because she didn't know — she didn't know them, so she didn't know what to do with them." Social Worker Ebomah went on to testify that "the entire time that I had the case, it just didn't seem to be a priority of [respondent-mother] to make sure that her mental health was in order so she could parent her children."

¶ 36        The juveniles' guardian ad litem (GAL) also had concerns about respondent-

mother's mental health conditions and respondent-mother's ability to parent all of the children. The GAL described the behavior of respondent-mother as "very erratic at times" and testified at the termination of parental rights hearing about several visits between respondent-mother and the juveniles during which respondent-mother was asked to leave due to her behavior. The GAL also recounted the problems that he witnessed during respondent-mother's visits with all four of her children, as follows:

> We observed visits where it was just her and one child, maybe two children, and she was able to tend to their needs, but when it came to all four, she would just get so frustrated, that the kids would be playing by themselves and she still couldn't manage it, you know. And the social worker was always in there, basically for the safety of the children, because there was [sic] times that she would have to intervene so one of the children wasn't hurt.

The GAL further testified that respondent-mother "is not realistic in her expectation of the kids or even realistic in the situation of the kids."

¶ 37    In addition, the trial court made several unchallenged findings of fact which described respondent-mother's repeated angry outbursts throughout the duration of the case including on the following occasions: (1) a March 2017 visit between respondent-mother and the children in which she "became erratic, refused to calm down, and continued to use profanity"; (2) a visit which respondent-mother had with the children in January 2018 during which respondent-mother "became agitated at the facilitator for redirecting her[,] . . . law enforcement was involved, and the visit

stopped"; and (3) a December 2019 visit of respondent-mother with the children which occurred while the termination of parental rights hearing was in progress, during which respondent-mother "was yelling, screaming, and accusing her cousin and all of the placement providers of mistreating her children."

¶ 38          The foregoing recapitulation of matters on the record in the present case shows that there was clear, cogent, and convincing evidence to support the trial court's Findings of Fact 22, 40, and 41, including the tribunal's determination that there was a "very high" likelihood of repetition of neglect if the children were returned to respondent-mother's care. While respondent-mother achieved progress on her case plan during the nearly four years that her children were in DSS custody, nonetheless respondent-mother did not make sufficient progress in order to demonstrate that there would not be a repetition of neglect. Respondent-mother remained prone to display angry outbursts, even as late in this series of occurrences as a visit with her children which transpired during the termination hearing proceedings. Neither the DSS social workers nor the GAL believed that respondent-mother had developed the necessary skills to care for all of her children simultaneously by the time of the termination of parental rights hearing.

¶ 39          Moreover, just as respondent-father, respondent-mother does not challenge the trial court's finding of fact that respondents will likely reunite after respondent-father has served his prison sentence, despite respondents' unaddressed domestic

violence cycle that the trial court found "renders them unsafe to parent as a couple." In light of these facts, the trial court properly concluded that there was a likelihood of repetition of neglect if the children were returned to respondent-mother's care, thus rendering her parental rights to be eligible for termination based on neglect. Since we have determined that this ground for termination is supported by the evidence and the trial court's resulting determinations, we refrain from evaluating respondent-mother's arguments which contest the existence of the remaining termination ground found by the trial court under N.C.G.S. § 7B-1111(a)(2). *See In re A.R.A.*, 373 N.C. at 194.

## IV.    Conclusion

¶ 40        The trial court did not abuse its discretion in denying respondent-father's motion to continue the termination of parental rights hearing after the trial court had already permitted respondent-father to obtain three previous continuances in an unsuccessful attempt to secure respondent-father's participation at the hearing and there was no presentation offered that the allowance of any further continuances would enhance respondent-father's ability to remotely attend the termination hearing. In addition, the trial court made sufficient findings of fact which were premised upon clear, cogent, and convincing evidence to support its ultimate conclusion that the parental rights of both respondent-mother and respondent-father were subject to termination based upon the existence of the ground of neglect. Neither

parent has brought forward in this appeal any challenge to the trial court's determination of the best interests of the juveniles. Consequently, the trial court's conclusion that it was in the best interests of the children Brian, Cyrus, Quintessa, and Craig that respondents' parental rights be terminated as ordered remains intact upon this Court's determination that the trial court did not commit error in this case. Therefore, we affirm the trial court's order regarding the termination of the parental rights of respondent-mother and respondent-father.

AFFIRMED.